**1**

```
1          IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3   ARNOLD J. HARRIS,           :
    Plaintiff
4                               :

5      VS                       :   NO. 1:15-CV-01411

6                               :
    J.A. ECKARD, et al
7   Defendants                  :

8

9       BEFORE:      HONORABLE JOSEPH F. SAPORITO, JR.
                     UNITED STATES MAGISTRATE JUDGE
10

        PLACE:       WILKES-BARRE, PENNSYLVANIA
11

        PROCEEDINGS:  EVIDENTIARY HEARING
12

        DATE:        TUESDAY, SEPTEMBER 26, 2017
13

14
    APPEARANCES:
15
    For the Plaintiff:      PRO SE:  ARNOLD J. HARRIS
16

17

18  For the Defendants:     JEFFREY M. PALADINA, ESQ.
                            Chief Counsel's Office
19                          Pennsylvania Department of Corrections
                            1920 Technology Parkway
20                          Mechanicsburg, PA  17050

21

22

23

24

25
```

## WITNESS INDEX

| FOR DEFENDANTS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Derrick Moore | 4 | 11 | -- | -- |
| Connie Green | 13 | 25 | 30 | -- |
| Diana Beatty | 32 | -- | -- | -- |

FOR PLAINTIFF

| Arnold Harris | 36 | 48 | -- | -- |

## EXHIBIT INDEX

| FOR DEFENDANTS | IDENTIFIED | ADMITTED |
|---|---|---|
| Exhibit A | 5 | 11 |
| Exhibit I | 6 | 40 |
| Exhibit B | 7 | 11 |
| Exhibit C | 7 | 11 |
| Exhibit D | 14 | 24 |
| Exhibit E | 16 | 24 |
| Exhibit F | 18 | 24 |
| Exhibit G | 19 | 24 |
| Exhibit K | 32 | -- |
| Exhibit H | 36 | 40 |
| Exhibit J | 37 | 40 |

FOR PLAINTIFF

| Exhibit 3 | 43 | |
| Exhibit 1 | 43 | |
| Exhibit 2 | 44 | |
| Exhibit 4 | 44 | |

1    THE COURT:  We are here in the matter of Arnold

2  Harris versus J.A. Eckard, et al, and we're here for the

3  purposes of conducting an evidentiary hearing to determine the

4  issue of exhaustion of administrative remedies.

5    We will make proposed findings of fact and

6  conclusions of law and make that report to Judge Yvette Kane,

7  who is the assigned district judge in this matter.

8    Before we proceed, does counsel have anything?

9    MR. PALADINA:  No, Your Honor.

10    THE COURT:  Mr. Harris, do you have anything to add

11  before we proceed?

12    MR. HARRIS:  Yes, Your Honor.

13    THE COURT:  Take your time.

14    MR. HARRIS:  Do I have to stay in these handcuffs?

15  It's really hard to maneuver my records.

16    THE COURT:  We would ask the authorities to allow

17  your handcuffs to be removed while we're here.

18    MR. HARRIS:  They can't be removed?

19    THE COURT:  They can be.

20    MR. HARRIS:  Thank you.

21    THE COURT:  You're welcome.

22    Since it is the defendant's burden on the exhaustion

23  of administrative remedies, we will allow the defense to

24  proceed.

25    MR. PALADINA:  Thank you, Your Honor.

**4**

1          I will call Derrick Moore to the stand.

2    DERRICK MOORE, having been duly sworn or affirmed according to

3    law, testified as follows:

4                         DIRECT EXAMINATION

5    BY MR. PALADINA:

6    Q.    Mr. Moore, where do you work?

7    A.    I currently work at SCI Camp Hill.

8    Q.    You are a counselor at SCI Camp Hill, is that correct?

9    A.    Yes.  I am a counselor II.

10   Q.    Just for the record, SCI Camp Hill is the initial intake

11   for inmates as they enter the Department of Corrections, is

12   that right?

13   A.    Yes.

14   Q.    In 2013 -- I will give you a specific date -- November

15   20th of 2013, were you tasked with conducting the orientation

16   of inmates on that day?

17   A.    Yes, I was.

18   Q.    Could you please describe for the Court what you do when

19   you do the orientation?

20   A.    When we do an orientation, what we do is, we go over the

21   order of stay on R Block, which is the Receiving Block that we

22   have at Camp Hill.

23         The inmates are required to get medical examinations,

24   psychological exams, assessment testing, as well as an initial

25   orientation interview to give them a custody level.

1  Q.    Was Mr. Harris one of the inmates that you gave an

2  orientation to on that day?

3  A.    Based on looking at the paperwork, he was in the

4  orientation.

5        It has been quite a while, so I don't quite remember

6  whether I saw him in the room, but because of the paperwork, he

7  had to have been there.

8  Q.    And the paperwork you're talking about -- well, we will

9  get to that.

10       As part of the orientation, sir, do you give inmates a

11  copy of the inmate handbook?

12  A.    Yes.  We give them a copy of the handbook.  We give them a

13  copy of the chapel schedule.  We give them a copy of everything

14  that they will need, all the information based on what we

15  provide as services at Camp Hill.

16  Q.    Sir, I will show you what has been marked as Exhibit A.

17             MR. PALADINA:  Can I approach the witness, Your

18  Honor?

19             THE COURT:  Yes, you may.

20  BY MR. PALADINA:

21  Q.    You have seen this before, correct?

22  A.    Yes, I have.

23  Q.    Is this an excerpt from the inmate handbook that Harris

24  would have received on November 20th, 2013?

25  A.    It is.

1  Q.    Sir, the inmate handbook, did it contain any information

2  about grievance policies?

3  A.    The inmate handbook gives directions in regards to

4  grieving, where they could find information to properly grieve

5  to help direct them on any information they would need.

6  Q.    So the table of contents shows, Exhibit I, the grievance

7  system, correct?

8  A.    Yes.

9  Q.    And then on Page 1 of the handbook, there's a sentence

10 that I have highlighted there, is that what you were referring

11 to when you said it gives them information about where they can

12 find policies?

13 A.    It is.

14 Q.    Could you just read that for the record, please?

15 A.    Copies of policies and procedures that contain rules that

16 directly affect you are available on the housing unit and in

17 the facility library.  The policies in the library may be

18 checked out or copied like a library book.

19 Q.    And on Page 8 of the handbook, it has a Section I for

20 inmate grievance procedures, and I highlighted Paragraph 5

21 there.

22        Could you read that part?

23 A.    If you desire compensation and/or other relief, you must

24 request that compensation and/or relief in your initial

25 grievance.

1  Q.    Sir, when you conduct the orientation, do you have forms

2  that the inmates sign to acknowledge receipt of these

3  documents?

4  A.    Yes, we do.

5  Q.    I will show you what's marked as Exhibit B.  I will put it

6  up on the screen.  I know you have seen this before.

7         Can you identify what that form is?

8  A.    This is a form acknowledging everything that we give them

9  during the orientation.  We ask them to put their name and

10 number on the top, and then they are to sign their signature on

11 every line based on the information that we give them during

12 the orientation.

13 Q.    Is this a copy of the form that Harris signed on that day

14 when he did the orientation?

15 A.    Yes, it is.

16 Q.    I will show you what has been marked as Exhibit C.

17        Could you please identify this document, please?

18 A.    This document we definitely acknowledge, because we want

19 them to know that as a part of the package that we give them in

20 orientation is the handbook and other information relevant to

21 whatever would help them through the process of their time in

22 incarceration.

23        We ask them to put their inmate number on there, their

24 name, their signature and the date, and because we facilitate

25 the actual orientation, we ask them to put our names on it.

1 Q.    This is a copy that Mr. Harris signed when he did the

2 orientation?

3 A.    Yes, and he would have wrote my name at the bottom.

4 Q.    So where it says staff issuing, Mr. Moore, that's you?

5 A.    Yes, sir.

6 Q.    Does this receipt tell them about they're to keep it with

7 them while they are incarcerated?

8 A.    It does.

9        The first paragraph says that they received a copy of the

10 inmate handbook and administrative directives.  It asks that

11 they understand that they are to retain the information and

12 keep it in good condition until they are released.

13       So once we give them the information and receipt for it,

14 it is their responsibility to be accountable for it.

15            MR. PALADINA:  Your Honor, at this time, I would move

16 for the admission of Commonwealth's Exhibits A, B and C.

17            THE COURT:  Mr. Harris, do you have any objection to

18 the admission of those?

19            MR. HARRIS:  Yes, Your Honor.

20            I did not receive a copy of the handbook at SCI Camp

21 Hill, Your Honor.  I did not receive a copy of the handbook at

22 SCI Graterford, Your Honor.

23            This handbook right here is a handbook, Your Honor,

24 that I received at SCI Huntingdon, which I received this three

25 years and two months after my date of entry, Your Honor.

1       Your Honor, this is what I received at SCI

2  Huntingdon, which is Exhibit 10.  This is the supplementary

3  handbook that I received at SCI Huntingdon.

4       This has no context of a grievance policy listed on

5  Page 2.  All it has is the inmate's grievance right there and

6  has the see personnel directory of Connie Green.

7       THE COURT:  Mr. Harris, let me just stop you there

8  for one moment.  The issue here is whether or not you have an

9  objection to the admission of Exhibits A, B and C based upon

10  some evidentiary issue.

11      I understand what you're saying, and you will be

12  given your opportunity certainly to testify and make argument

13  concerning your position, but in terms of whether or not you

14  have a specific evidentiary objection to the admission of

15  either Exhibits A, B, or C, that's what I'm asking you.

16      MR. HARRIS:  Yes, Your Honor.

17      I did not receive a copy of the handbook by

18  Mr. Derrick Moore at SCI Camp Hill, Your Honor, because an

19  inmate handbook is priceless to an inmate.  I would have kept

20  this and had this, just like I had this one, which is three

21  years ago.

22      Now, I received a handbook four months before I

23  received this, Your Honor.

24      THE COURT:  I understand that, but you're objecting

25  to the admission of the documents --

1          MR. HARRIS:  Right.

2          THE COURT:  -- based on your position that you didn't

3 receive them.

4          I understand that that's the issue, basically, that I

5 am asked to make a proposed finding of fact and conclusion of

6 law on.  I understand that.

7          But Mr. Paladina has moved for the admission of

8 Exhibits A, B, and C, and I have asked you if you have an

9 evidentiary objection, not so much the issue of whether you

10 received them or not.  I understand that your position is that

11 you have not received the document in question.

12          So in terms of your objection for purposes of a

13 ruling on it, I'm going to overrule your objection and I'm

14 going to allow the admission of Exhibits A, B, and C into

15 evidence.

16          You will have your opportunity during your case to

17 present your side of the story regarding whether you, in fact,

18 received them, the documents, or not.

19          Do you understand that?

20          MR. HARRIS:  Yes, Your Honor.

21          THE COURT:  You may be seated.

22          So for purposes of ruling, the objection is

23 overruled, and we will admit Exhibits A, B, and C into

24 evidence.

25

1          (At this time, Defendant's Exhibits A, B & C were

2    admitted into evidence.)

3          MR. PALADINA:  Your Honor, I have no further

4    questions for Mr. Moore.

5          THE COURT:  Now, Mr. Harris, you do have the right to

6    cross-examine Mr. Moore, and you are free to do so, sir.

7                         CROSS EXAMINATION

8    BY MR. HARRIS:

9    Q.   Mr. Moore, do you have the documentation showing that I

10   did sign for a handbook personally?

11   A.   The evidence that the defense showed is the only thing

12   that I have that you did receipt for the information.

13          MR. HARRIS:  Your Honor, when I received this

14   handbook at SCI Camp Hill, I had to sign a waiver stating -- a

15   title page with this handbook on it -- stating that I received

16   this handbook personally, because if you lose this handbook,

17   there will be a charge by DOC to retain another one.

18   BY MR. HARRIS:

19   Q.   Do you have records personally with a waiver showing that

20   I personally received a handbook from you, Mr. Moore?

21   A.   The only thing that I have -- based on your signature

22   having received the handbook is the only thing I have.

23          After the orientation, I would not have any access to any

24   of the information regarding whether you had it or not.  All I

25   know is that you signed and receipted for it.

1  Q.    But you want this Court to believe that you personally

2  gave me a handbook?

3  A.    Everyone gets it.

4  Q.    I don't have it in my possession now.

5  A.    Everyone in orientation gets a handbook, and they don't

6  sign that they received it until they acknowledge that they

7  have it in front of them.  You signed the paperwork.

8  Q.    Can I see this paperwork that I supposedly have signed for

9  this handbook that I supposedly have?

10            THE COURT:  That would be Exhibit C, as I understand

11  it.

12            MR. PALADINA:  Yes, Your Honor.

13            I put a stack of all the exhibit copies for

14  Mr. Harris.

15            Mr. Harris, if I can assist you, I can show you.

16            THE COURT:  That will be fine.

17            MR. HARRIS:  I need to see that for the handbook

18  personally, please.

19            MR. PALADINA:  This was Exhibit A, which was the

20  handbook.  This was Exhibit B, which is you signed for the

21  handbook.  This is Exhibit C.  These have been admitted into

22  evidence.

23            MR. HARRIS:  Your Honor, I still contend that I never

24  received a handbook, which I would have surrendered when I left

25  Camp Hill, Your Honor.

1    THE COURT:  Just so the record is clear, Mr. Paladina

2 has showed you Exhibits A, B, and C, the packet that he

3 provided to you before we commenced the hearing, is that right?

4    MR. HARRIS:  Yes, Your Honor.

5    THE COURT:  You have those three documents in front

6 of you?

7    MR. HARRIS:  Yes, Your Honor.

8    THE COURT:  Have you seen the document entitled

9 Receipt of Handbook, Exhibit C?

10    MR. HARRIS:  I never received a handbook, Your Honor.

11    THE COURT:  Well, there is a signature on there.  Do

12 you see that?

13    MR. HARRIS:  I probably didn't know what I was

14 signing.

15    THE COURT:  You will be able to testify about all of

16 that during your case.

17    Do you have any more questions for Mr. Moore?

18    MR. HARRIS:  No, Your Honor.

19    THE COURT:  Mr. Moore, you may step down.  Thank you,

20 sir.  Be careful getting down.

21    MR. PALADINA:  I will call Connie Green to the stand.

22 CONNIE GREEN, having been duly sworn or affirmed according to

23 law, testified as follows:

24                    DIRECT EXAMINATION

25 BY MR. PALADINA:

1  Q.    How are you employed, ma'am?

2  A.    I'm the superintendent's assistant at SCI Huntingdon.

3  Q.    How long have you had that position?

4  A.    Ten years.

5  Q.    Are you familiar with how the inmates receive handbooks in

6  the DOC?

7  A.    Yes.

8  Q.    Could you, first of all, describe that to the Court?

9  A.    Well, as already been testified, when inmates come into

10  the intake center, they receive a copy of the handbook at that

11  time.

12  Q.    And the intake center is Camp Hill?

13  A.    SCI Camp Hill, yes.

14       That handbook stays with them throughout the DOC.

15  Wherever they might go to serve their time, the handbook goes

16  with them.

17       When the handbook is updated, every inmate gets a new

18  handbook.  Also, at every institution that an inmate goes to,

19  they receive a handbook supplement specific to that

20  institution.

21  Q.    And the process you describe, I'm going to show you -- and

22  I know you have already seen this -- this is Exhibit D, which

23  is Policy 1.1.1?

24  A.    Yes.

25  Q.    And I just want to point out a couple things.

1      Section B there describes -- excuse me -- Section 8 there
2  describes how inmates receive it at orientation?
3  A.    Yes.
4  Q.    And then Section C talks about inmate handbook
5  supplements?
6  A.    Yes.
7  Q.    So Harris would receive the handbook at Camp Hill, but
8  when he got to Huntingdon, he would have received just the
9  supplement, is that correct?
10 A.    Correct.
11 Q.    You heard him mention -- well, first of all, can you
12 describe more fully what an inmate handbook supplement is?
13 A.    The inmate handbook supplement is specific to that
14 institution.
15      So it doesn't -- the handbook itself refers to all the
16 DC -- the administrative directives that apply to the inmates
17 and how their rules apply to them.  That is the inmate
18 handbook.  The supplement is more the rules that are specific
19 to, say, for example, SCI Huntingdon.
20      We have rules that are different for our institution for
21 showering, things on the block or units, how to conduct
22 yourself on the unit, meal times, programming, yard time in
23 general specific to that institution.
24      So the handbook supplement does not refer so much to the
25 policies as the inmate handbook does.

1  Q.    You heard, I think, Harris talk about -- the plaintiff

2  talk about receiving a supplement when he got to SCI Huntingdon

3  that didn't include everything about the grievance process?

4  A.    Correct.

5  Q.    Does that make sense?

6  A.    Yes.  I think the only thing it includes about the

7  grievance process is my name as the coordinator.

8  Q.    I will show you what has been marked as Exhibit E.

9        What is that document?

10  A.    This is DC Admin 804, which is the inmate grievance

11  system.

12  Q.    And was this the grievance policy that was in effect on or

13  around March 27th, 2015, when Harris dated his grievance about

14  secondhand smoke?

15  A.    Yes.

16  Q.    At SCI Huntingdon, how are these policies available to

17  inmates?

18  A.    Well, the policies are the DC administrative directives.

19  They are available on each housing unit, and they are also

20  available in the library and are pretty much spelled out in the

21  inmate handbook.

22  Q.    When you say spelled out, you're talking about -- and I

23  will go back to Exhibit A -- you're talking about the sentence

24  that I highlighted there that tells them where they can get the

25  full policies?

1  A.    Yes.

2  Q.    Copies of policies and procedures that contain rules are

3  available in the housing unit and facility library?

4  A.    Yes.

5  Q.    And at SCI Huntingdon, the grievance policy is available

6  on all housing units and in the library, correct?

7  A.    Yes.

8  Q.    And are those policies kept up to date?

9  A.    Yes.

10  Q.    What is an inmate to do if they want to see a copy of

11  them?

12  A.    On the unit, all he needs to do is ask the block sergeant,

13  and I believe they have a sign-out sheet and he can sign it out

14  and borrow it and take it to his cell and to the library or

15  whatever.  If he wants his own photocopy, he would have to go

16  to the library to get that.

17  Q.    Going back to Exhibit A, I want to point out to you

18  Section 1 talks about how the inmates have to prepare their

19  initial grievance?

20  A.    Correct.

21          MR. HARRIS:  Excuse me.  Where was this at, what

22  section?

23          MR. PALADINA:   Section 1.  I'm about ready to show

24  her Paragraph 12 of Section 1.

25  BY MR. PALADINA:

1  Q.    And under Paragraph 12 of Section 1, 12 D, does it

2  instruct the inmates that if they want compensation, they have

3  to request it?

4  A.    Yes.

5  Q.    And can you just read that paragraph into the record,

6  please?

7  A.    If the inmate desires compensation or other legal relief

8  normally available from a court, the inmate must request the

9  specific relief sought in his or her initial grievance.

10  Q.    Just to be clear, this policy became effective May 1st of

11  2014?

12  A.    Yes.

13  Q.    I will show you what has been marked as Exhibit F.

14        Is this the prior version of the same policy?

15  A.    Yes.

16  Q.    And this became effective in 2011?

17  A.    Yes.

18  Q.    And this would have been in effect when he received the

19  inmate handbook at Camp Hill?

20  A.    Yes.

21  Q.    Paragraph 12, there also contains requirements that they

22  request a specific relief sought in his or her initial

23  grievance?

24  A.    Yes.

25  Q.    So that requirement has been in effect since he's been at

1  Camp Hill, correct?

2  A.    It's been in effect as long as I have been the grievance

3  coordinator, yes.

4  Q.    Have you reviewed Harris' grievance history?

5  A.    Pardon me?

6  Q.    Have you reviewed Harris' grievance history?

7  A.    Yes.

8  Q.    Do you know how many grievances he filed at SCI Huntingdon

9  related to secondhand smoke?

10  A.    Just the one that I know of.

11  Q.    The one that you know of is Exhibit G here, which is

12  Grievance No. 559269?

13  A.    Yes.

14  Q.    Is this a copy of his initial grievance form?

15  A.    Yes.

16  Q.    I have highlighted two parts in that form.

17      Could you read into the record the first instruction, No.

18  1?

19  A.    Refer to the DC Admin 804 for procedures on the inmate

20  grievance system.

21  Q.    And then under A where it talks about the claim that they

22  have to put, could you read the part that I highlighted?

23  A.    State all relief that you are seeking.

24  Q.    And that's in bold, correct, that form?

25  A.    Yes.

1  Q.    Did Harris ask for money damages in this grievance?

2  A.    No.

3  Q.    Can you just, you know, summarize for the judge the

4  process of this grievance, you know, what happened to it?

5  A.    Well, he filed his grievance and I initially rejected it,

6  and then he resubmitted it, I believe, and I think I rejected

7  it again.

8        He appealed the rejection of the grievance to the

9  superintendent, and the superintendent overruled my rejection

10 and directed that it be addressed.

11 Q.    And the rejection was for untimeliness?

12 A.    I believe it was.

13 Q.    Let me stop you right there.

14       Exhibit G contains -- well, first of all, let me hand it

15 to you and go through it and explain to the Judge what is all

16 in there.

17 A.    So the first page of this exhibit is the initial grievance

18 that Mr. Harris filed on March 27th, 20015, and then I rejected

19 it on March 30th, 20015.

20       As the grievance coordinator, it's my decision to

21 determine if the grievance is filed in accordance with policy,

22 and my decision was that it was not and that it was not

23 submitted within 15 working days of an event.

24       So I rejected it, and I explained at the bottom that he

25 could resubmit his grievance.  So he resubmitted it on April

1  1st, 2015, and I rejected it again on April 2nd, 2015, for the

2  same reason.

3      So the policy permits him to resubmit a rejected grievance

4  one time.  So if he still disagrees with my decision, then he

5  has an appeal to the facility manager, which is the

6  superintendent.  So he did appeal this grievance on April 1st

7  to the superintendent.

8  Q.   When he resubmitted the grievance, he didn't put a claim

9  for money damages in there?

10 A.   No, not in either one.

11 Q.   What happened next in the process?

12 A.   So he submitted an appeal on April 1st, 2015, to the

13 facility manager or the superintendent, and then on April 9th,

14 Superintendent Eckard remanded the grievance to me to assign it

15 to a grievance officer for investigation and response.

16     That's also part of the grievance officer's duty.  If a

17 grievance is filed properly, then I assign it to the grievance

18 officer to investigate the inmate's claim and provide a

19 response.

20     So at the appeal level, the superintendent remanded it

21 back to me to assign it to a grievance officer to investigate

22 his claim.

23 Q.   He did that because he felt that the grievance was timely?

24 A.   Yes, he felt that the grievance was timely.

25 Q.   What happened next?

1  A.    So then the grievance was assigned to Major Walters, and

2  on 5/1, he answered the grievance and recorded his finding for

3  Mr. Harris.

4  Q.    What happened next?

5  A.    So Mr. Harris, apparently, he disagreed with Major

6  Walters' finding, and so then he had the right to appeal again.

7  Once he got an initial response, then he could appeal it again

8  to the superintendent, which he did.

9      Then the superintendent responded to his appeal on May

10 20th, and Superintendent Eckard upheld the initial response of

11 Major Walters.

12 Q.    Then he appealed to the Secretary Pluck's (phonetic)

13 grievance?

14 A.    He did.  I don't have access to that appeal, but I have

15 the decision.

16 Q.    The decision is the last page?

17 A.    Um-hum.

18 Q.    Of Exhibit G, correct?

19 A.    Yes.

20     The secretary's office of inmate grievance appeal upheld

21 the initial response and the superintendent's appeal.

22         MR. PALADINA:  I move for the admission of D, which

23 is the Policy 1.1.1 excerpt discussing how inmate handbooks are

24 distributed; E, which is the grievance policy that was in

25 effect at the time that he filed his grievance; F, which is the

 1    excerpt of the grievance policy that was in effect when he was

 2    at Camp Hill; and G, which is the grievance packet for

 3    Grievance No. 559259.

 4            THE COURT:  Mr. Harris, Mr. Paladina has moved for

 5    the admission of Exhibits D, E, F and G.

 6            You have those exhibits in your packet, is that

 7    correct?

 8            MR. HARRIS:  Yes, sir.  Yes, Your Honor.

 9            THE COURT:  You know that he has moved for their

10    admission into evidence.

11            Do you have any legal objection to their being

12    admitted into evidence at this time?

13            MR. HARRIS:  Yes, Your Honor.  I object to his

14    ruling.

15            Do I get to cross-examine Miss Green?

16            THE COURT:  You will have the opportunity to

17    cross-examine her.

18            For purposes of the flow of the hearing, there's a

19    motion to admit those four documents into evidence, and I'm

20    asking you, do you have an objection to their admission into

21    evidence?

22            MR. HARRIS:  Yes, Your Honor.

23            Did I hear him say that these were on our block in

24    the prison, these were distributed on the block in the prison,

25    or they posted it on the bulletin board?

1          THE COURT:  I thought you were able to request those

2     forms from the block supervisor, am I correct?

3          THE WITNESS:  The block officers.

4          MR. HARRIS:  That is not true.

5          THE COURT:  All right.  That's an issue that you can

6     raise during your testimony, and you are free to cross-examine

7     any witness concerning those issues as well.

8          But for purposes of a legal objection, you indicate

9     you object to the admission of those documents.

10          What is the basis for your objection?

11          MR. HARRIS:  The basis for my objection, Your Honor,

12     is that they were not available to the inmates on the block.

13          THE COURT:  I understand that that's your position

14     about that, and that's a factual determination that I'm

15     required to make and make a proposed finding of fact on that

16     issue.

17          In terms of any legal objection, I see no legal

18     impediment to their admission into evidence.  So for the

19     purposes of the record, we will overrule your objection, and we

20     will admit Exhibits D, E, F, and G into evidence.

21        (At this time, Defendant's Exhibits D, E, F & G were

22     admitted into evidence.)

23          THE COURT:  Mr. Paladina, do you have any other

24     questions?

25          MR. PALADINA:  I have no other questions for Miss

1  Green.

2         THE COURT:   You may cross-examine.

3                    CROSS EXAMINATION

4  BY MR. HARRIS:

5  Q.   Miss Green, how are you this morning?

6  A.   I'm fine.   How are you doing?

7  Q.   All right.

8       You stated that you denied my first grievance on 3/27/15

9  as being untimely?

10 A.   You filed it on 3/27 and I denied it on 3/30.

11      Yes, I determined it was untimely.

12 Q.   I don't understand, Miss Green, how it was untimely,

13 because on the grievance itself, I wrote in the grievance I

14 spoke to Officer Myers on 3/23, I spoke to the unit manager on

15 3/24, I wrote a request to staff on 3/26, and I filed a

16 grievance on 4/1.

17      Now, my addition, Miss Green, from 3/23 to 4/1, that's

18 only nine days.   That's not 15 days.

19 A.   That's correct.

20      The reason I rejected your grievance is because grievances

21 are based on events, and simply contacting a staff member

22 concerning a complaint does not necessarily make an issue

23 timely.

24      So your issue -- your issue was the secondhand smoking on

25 the unit in your grievance, and just because you complained

about it on a certain day doesn't make it timely, because that
secondhand smoke, according to you, has been going on for a
long time.  So that's why I rejected it.  The superintendent
disagreed with me, and that is why he overruled my rejection.

Q.    Might he overruled your objection because him and I were
both right and you were wrong?

A.    No.

Q.    Why?

A.    He would -- well, let me back up.

      He felt that the issue was timely, that you explained how
your issue was timely, and he disagreed with my decision, and
as the superintendent and on appeal by policy that is his role
to do that, and so he overturned my rejection of your
grievance.

Q.    That's correct.  He stated that my argument has merit
and --

          MR. PALADINA:  Objection, Your Honor.  Argumentative,
and it has been asked and answered.

          THE COURT:  Overruled.  You may proceed.

BY MR. HARRIS:

Q.    He stated, and I quote, I must agree that your argument
has merit; therefore, your grievance will be remanded for the
grievance coordinator and it will be assigned to a grievance
officer for investigation.

A.    That's correct.  He said that you feel your grievance is

1  timely, and after reviewing the initial grievance -- excuse

2  me -- the initial grievance, he agreed that your argument that

3  the grievance was timely had merit.

4      He wasn't ruling -- he wasn't making an agreement to your

5  issues.  He was making a decision as to whether it was timely

6  or not.

7  Q.   I'm lost, Miss Green.  I'm lost in this whole issue, as

8  far as you saying it was untimely and you saying he agreed

9  because it was untimely, but he's agreeing to my issues.  I'm

10  lost in this whole thing.

11      Can you break this down in layman's terms for me, please?

12  A.   I rejected your grievance because I felt it was untimely.

13  I rejected it twice because I felt it was untimely.

14  Q.   Now, hold it right there for a minute, Miss Green.

15      It was untimely because it was not submitted within 15

16  days of the events in which they occurred?

17  A.   Correct.

18      My thinking as a grievance coordinator, which is my duty

19  to do that, my decision was that it was not timely.

20      Even though you complained on certain dates to certain

21  staff members, I felt that that did not make your complaint

22  timely.

23  Q.   But, Miss Green, it's stated right here, as of 3/23, you

24  know, I went to personally an officer on the block and

25  complained.

1      How was I supposed to initiate this complaint if something

2  was bothering me in a grievance?  Isn't that what a grievance

3  is, you're supposed to grieve something?

4  A.   That's correct, but you have to follow the procedures

5  outlined in the policy, and in my opinion, you did not.

6  However, the superintendent disagreed with me.

7  Q.   What did I miss, Miss Green?  What did I miss?

8           MR. PALADINA:  Objective.  Argumentative and asked

9  and answered.

10          THE COURT:  Let me just interrupt for a moment.

11          At this point, the objection is sustained.

12          Mr. Harris, you seem to be arguing with Miss Green

13  regarding the timeliness of your grievance, and she determined

14  in her opinion that it was untimely.

15          You then exercised your right to appeal her findings,

16  and you appealed to the superintendent.  The superintendent

17  agreed with you that your grievance was timely.

18          I think you're getting confused when he says your

19  grievance has merit.  I think from a timeliness standpoint, it

20  was meritorious.

21          He overruled her decision and remanded it back for

22  purposes of assignment to a grievance investigator.  That's

23  where Mr. Walters came into play as the grievance investigator,

24  and then it took on a different life after that.

25          But I think what you're getting confused with is her

1  decision here is not whether or not you received the handbook,

2  which is the issue that is really before the Court here today,

3  not the issue of the timeliness of the filing of your

4  grievance.

5          I think that everyone would agree that your grievance

6  as filed is considered to be timely by virtue of Superintendent

7  Eckard's response to your appeal.

8          So I think the timeliness is not an issue.  I think

9  Miss Green would agree with me that it's deemed timely, is that

10  correct?

11          THE WITNESS:  Correct.

12          THE COURT:  So from that perspective, the timeliness

13  is not the issue.  The issue is whether or not you received the

14  handbook.

15          Now, Miss Green gave some testimony regarding the

16  practices and the procedures that the State Correctional

17  Institute at Camp Hill implemented, and she also discussed the

18  issues of the receipt of a supplemental handbook when you are

19  transferred to another prison within the state correctional

20  system.

21          You're free to inquire on those issues as well, but

22  in terms of the timeliness, it's really not an issue that is

23  before me.  It's deemed timely, and so you may move on.

24  BY MR. HARRIS:

25  Q.  Miss Green, you stated that I did receive a handbook, or

1   did I receive a handbook supplement?

2   A.   I don't believe I stated that.

3   Q.   It sounded to me like you said I received a handbook in

4   SCI Huntingdon when I actually indeed received the handbook

5   supplement.  This is what I received, not a handbook.

6        I received the supplement upon entry with orientation at

7   SCI Camp Hill, and this has no grievance policy in it.

8   A.   Correct.  That's what I said.

9   Q.   Okay.  I'm sorry.

10            MR. HARRIS:  No more questions, Your Honor.

11            THE COURT:  Any redirect?

12                       REDIRECT EXAMINATION

13  BY MR. PALADINA:

14  Q.   Just to clarify, the policy he just held up is a

15  supplement that he received at Huntingdon?

16  A.   Yes.

17  Q.   You're not talking about the full inmate handbook that

18  Mr. Moore testified to?

19  A.   No.

20            MR. PALADINA:  That's all I have, Your Honor.

21            THE COURT:  I just have a few questions for you.

22            The inmate handbook that you made reference to in

23  direct and cross examination, is that document disseminated to

24  the inmate at their orientation when they arrive at SCI Camp

25  Hill?

1      THE WITNESS:  Yes.

2      THE COURT:  And does that handbook contain the

3 grievance procedure?

4      THE WITNESS:  Yes.

5      THE COURT:  Does that grievance procedure that you're

6 referring to contain the requirement that all relief must be

7 requested in the initial grievance including monetary

8 compensation?

9      THE WITNESS:  Yes.

10      THE COURT:  So your position is that Mr. Harris would

11 have received that handbook with those particulars addressing

12 the issue of compensation and so on in the initial grievance at

13 his orientation when he was at SCI Camp Hill?

14      THE WITNESS:  Yes.

15      THE COURT:  Anything further, counsel?

16      MR. PALADINA:  I do not.

17      THE COURT:  Mr. Harris, do you have anything further

18 that you would like to ask?

19      MR. HARRIS:  Your Honor, except that I do stand on

20 the issue that I did not receive an inmate handbook.

21      THE COURT:  You will be able to address that issue

22 when it is your turn to testify.

23      MR. PALADINA:  I call Diana Beatty.

24 DIANA BEATTY, having been duly sworn or affirmed according to

25 law, testified as follows:

DIRECT EXAMINATION

BY MR. PALADINA:

Q.    How are you employed, ma'am?

A.    I'm corrections school principal at SCI Huntingdon.

Q.    As school principal, do you supervise the inmate law library?

A.    Yes, I do.

Q.    And do you sometimes work in the law library?

A.    Yes, I do.

Q.    During the years of 2014 and 2015, did you work in the law library?

A.    Yes, I did.

Q.    Are you familiar with the plaintiff, Mr. Harris?

A.    Yes.

Q.    Was he frequently in the library?

A.    Yes.

Q.    I will show you what I have marked as Exhibit K.

      This is a big stack of papers, and we won't go through them individually, but you prepared these for me?

A.    Yes.

Q.    And these are the law library request slips and call-out sheets from '14 to '15?

A.    They're call-outs.  These we went back to the time that Inmate Harris arrived at the institution, and these were all the ones that we had on the record.

1       The call-outs, he writes a request to come to the library.

2   We then schedule him on a call-out.   Then when he arrives, he

3   signs in for his period of time.

4       They can come two times a week, three times a week if they

5   have a deadline.

6   Q.    This establishes for certain that he was in the law

7   library for '14 and '15 and had access to it, correct?

8   A.    Yes.

9   Q.    Is the grievance policy available in the law library at

10  SCI Huntingdon?

11  A.    At all times, yes.

12  Q.    And it has been as long as you have been supervisor, as

13  long as you remember?

14  A.    Yes.

15  Q.    Is it kept updated?

16  A.    Yes.   We actually even have a sign-in page in there that

17  we implemented after I became principal there where they sign

18  when they update a page.

19      If something changes in the policy and it's updated, we

20  sign on and put that new section in the policy as well.

21  Q.    That's common knowledge among inmates that the policies

22  are available in the law library?

23  A.    Yes.

24  Q.    And during any of these days that Harris was in the law

25  library, he could have requested to see the 804 policy?

A.    Yes, or he could have asked where they are or where does

he get a policy, and we often discuss policies with inmates

because they have questions.

When I'm working in the library, I will get the policy

book out and we will open it up and look at policies to explain

why things are the way they are.

MR. PALADINA:  That's all the questions I have for

her.  I move for the admission of Exhibit K.

THE COURT:  Mr. Harris?

MR. HARRIS:  No questions, Your Honor, at this time.

THE COURT:  Ms. Beatty, I thank you very much.  You

may step down.

MR. PALADINA:  Your Honor, I have very limited

questions for Mr. Harris.  I would like to call him on cross.

THE COURT:  Mr. Harris, you may assume the witness

stand.

ARNOLD HARRIS, called as of cross examination, having been duly

sworn or affirmed according to law, testified as follows:

THE COURT:  Before we proceed, Mr. Harris, I'm just

going to explain to you that Mr. Paladina asked to call you as

a witness as of cross examination.

The defendants have the burden of proof on this

issue.  They have the right to call you as a witness, and

because you're a party, he's calling you as of cross

examination.

1    That means that he gets to ask leading questions, as
2  opposed to broad questions.  He can ask you a leading question
3  if it's his desire.

4    Do you understand that, sir?

5    MR. HARRIS:  Do I have to answer them, Your Honor, or
6  can I plead the Fifth or whatever for contribution (sic) for,
7  you know, just in case I might incriminate my own self?

8    THE COURT:  Well, if it's a matter that involves a
9  criminal act, you certainly have the right to assert the Fifth
10 Amendment privilege, but you just simply cannot rest on the
11 Fifth Amendment privilege without a legal basis to do so.

12    Do you understand that?

13    MR. HARRIS:  Yes, Your Honor.

14    Your Honor, I don't have any counsel to represent me,
15 and I really don't understand a lot of the proceedings.

16    THE COURT:  I understand that.

17    Well, here is what we will do:  I don't suspect that
18 the questions that Mr. Paladina is going to ask you are
19 inclined to allow you to incriminate yourself on any criminal
20 wrongdoing.

21    To the extent that they do, I will afford you notice
22 of your right under the Fifth Amendment with giving you time to
23 make a decision as to whether you will invoke your Fifth
24 Amendment privilege.

25    Do you understand that?

1          MR. HARRIS:  Yes.

2          THE COURT:  We will give you that courtesy.

3          In the meantime, Mr. Paladina has some questions for

4  you.

5                     DIRECT EXAMINATION

6  BY MR. PALADINA:

7  Q.    Sir, I'm not trying to trick you.  If you don't understand

8  the question, just ask me to rephrase it, okay?

9  A.    Yes.

10 Q.    This isn't the first case that you filed in Federal Court

11 involving prison conditions, correct?

12 A.    Yes.

13 Q.    In fact, when you were at SCI Graterford, you filed a case

14 in the Eastern District of Pennsylvania about secondhand smoke

15 at Graterford?

16 A.    That's correct.

17 Q.    In that case, the prison officials were represented by, I

18 think, Kevin Bradford.  Do you remember that name?

19 A.    That was the deputy attorney general.

20 Q.    I'm going to show, sir, and you should be able to see it

21 on your screen up there, what I marked as Exhibit H.

22     Now, the defendants in that case filed a motion to dismiss

23 in the alternative of a motion for summary judgment.

24     Do you remember that?

25 A.    Yes.

1  Q.    And in the first paragraph there it says that you have not

2  complied with the Prison Litigation Reform Act exhaustion

3  requirement, correct?

4  A.    That's correct.

5  Q.    In fact, I'm going to show you Exhibit J, and for the

6  record, these were filed in the Eastern District, Case Number

7  13-CV-06031.

8       You filed, in fact, a response to the motion, correct?

9  A.    Could you repeat the question?

10 Q.    Did you file a response to that motion that I marked as

11 Exhibit H?

12      Did you file a response to this in your other case?

13 A.    I believe I did.  I can't remember.

14           MR. PALADINA:  If I could approach the witness, Your

15 Honor?

16           THE COURT:  You may.

17 BY MR. PALADINA:

18 Q.    Again, I'm not trying to trick you.  I will show you

19 Exhibits H and J.

20      That's the motion.  Is this the response you filed?  Take

21 your time and look at it.

22           MR. HARRIS:  Your Honor, certain things --

23           THE COURT:  He has some questions for you first.

24           MR. HARRIS:  -- certain things are fuzzy in my

25 memory, because in the year 2016, I was in a coma at Altoona

1  Hospital and I was on life support.  Certain things I can't

2  remember that well.

3          This looks familiar, but I can't be exactly 100

4  percent sure.

5  BY MR. PALADINA:

6  Q.   So you don't remember for sure whether or not --

7  A.   I can't remember, because I was in a coma for like about a

8  week.

9  Q.   I'm going to show you an exhibit to the motion the

10 Attorney General filed.

11         MR. PALADINA:  If I could approach the witness again,

12 Your Honor?

13         THE COURT:  You may.

14 BY MR. PALADINA:

15 Q.   I marked this as Exhibit I.

16      Do you remember that document?

17 A.   I don't know who she is.

18 Q.   No, I'm not asking if you know who she is.

19      This was an exhibit the Attorney General sent you as part

20 of the motion.

21 A.   I don't remember this.  I'm sorry.  I don't remember any

22 of this.

23 Q.   It is at least possible that you received that, correct?

24 A.   I'm sorry.  I can't remember.

25 Q.   You don't remember whether you received it or not?

A.    I can't.

MR. PALADINA:  Your Honor, I would ask the Court to take judicial notice that the documents are publically available at the Eastern District, Case No. 13-CV-06031, Harris versus Weinberger.

Exhibit H is a motion to dismiss in the alternative of summary judgment that raised the issue of exhaustion.

Exhibit I contains two things.  It was filed at Document No. 17-5.  It's a declaration of Wendy Shaylor who was a grievance coordinator at SCI Graterford, and it contains a full copy of the Department of Corrections grievance policy, and it was filed February 28th, 2014, at Docket No. 17.5.

I also note that the motion contains a certificate of service by Mr. Bradford indicating that he sent this on to Mr. Harris, and I would move for Exhibit J, just for the purposes of showing that Harris responded to the motion.

THE COURT:  Your motion to take judicial notice of Exhibits H, J and I -- is that correct?

MR. PALADINA:  Correct.

THE COURT:  -- the motion is granted, and we will take judicial notice of those items.

Mr. Harris, so that you are aware, when Mr. Paladina asked the Court to take judicial notice of those documents, there is a rule of evidence that allows the Court to judicially notice documents that had been filed in publically available

1 judicial proceedings.

2        It's my understanding that the documents were filed

3 in the United States District Court for the Eastern District of

4 Pennsylvania, and those documents have been identified as

5 filings in the cases in which you were involved in, and so we

6 will take judicial notice of those filings, and that is, we are

7 receiving those items as evidence in this case.  Do you

8 understand that?

9    (At this time, Defendant's Exhibits H, I and J were

10 received into evidence.)

11        MR. HARRIS:  Yes, Your Honor.

12        THE COURT:  You may proceed.

13        MR. PALADINA:  Your Honor, I have no further

14 questions for him in my case, and we would rest, the defense

15 would rest.

16        THE COURT:  Since you are already on the witness

17 chair, Mr. Harris, you may proceed with your testimony in your

18 case.

19        I would ask that you stick to the issue of the

20 receipt of the subject inmate handbook and whether or not you

21 were also aware of the requirement that you were to put in your

22 grievance all of the relief that you were requesting, which

23 would include monetary compensation.  So you may proceed.

24        MR. HARRIS:  Your Honor, I was admitted into SCI

25 Huntingdon on March 20th of 2014.

1            I believe I entered into evidence what I received,

2   which was the supplemental handbook, which has no listing of a

3   grievance policy in it.

4            The grievance policy, upon entering into SCI

5   Huntingdon, was never communicated to me personally or to no

6   inmate.

7            In 2017, I received another supplemental handbook,

8   the 2017 SCI inmate supplemental handbook, which also doesn't

9   contain an inmate grievance policy at all, just as the

10  supplemental handbook of 2014.  I entered that into evidence

11  also.

12           Your Honor, May 4th of 2017, I received this

13  handbook.

14           THE COURT:  So the record is clear, would you

15  identify the handbook that you are referring to?

16           MR. HARRIS:  Yes.  This handbook says the

17  Pennsylvania Department of Corrections, Inmate Handbook 2017,

18  John E. Wetzel, Secretary of Corrections.

19           This is the only handbook that I know of while a

20  resident in the Department of Corrections.

21           This handbook has nothing whatsoever in reference

22  about monetary compensation on the initial grievance before

23  filing a lawsuit.  None of these have any context as to initial

24  compensation or monetary compensation on your initial grievance

25  before filing a lawsuit.  This was not ever communicated to me,

and if it was, I have no -- I have no understanding or comprehension of what was sent.  These are all that I have gotten upon the initial intake of SCI Huntingdon.

As for Camp Hill, I have never received an inmate handbook.  If I had received an inmate handbook, I would have kept it, like I have kept these for so many years.

Mr. Moore claimed that he has given me an inmate handbook, but that was only four months prior to me receiving this handbook.  Why do I have this handbook and no inmate handbook of SCI Camp Hill?  It would be to my benefit to keep that inmate handbook due to the corruption at hand of the Department of Corrections and for me to find out what my legal rights are in reference to appealing and filing an appeal on using the grievance system.

This is the only handbook I have ever known, and these are the only procedures that I have ever known in the Department of Corrections, and I have been in the Department of Corrections, a resident in cell for at least about five years and a couple of months.

Your Honor, that is the context.

THE COURT:  So that we have a clean record, the documents that you are referring to, we will take them in reverse order, can you hand up the small pamphlet?

MR. HARRIS:  The small pamphlet is the inmate handbook.

1          THE COURT:  This is the inmate handbook from the

2  Pennsylvania Department of Corrections, handwritten issued May

3  4th, 2017, at 9:21 p.m., and we will mark this as Plaintiff's

4  Exhibit No. 3.

5          You referenced two others.

6     (At this time, Plaintiff's Exhibit No. 3 was marked for

7  identification.)

8          MR. HARRIS:  Your Honor, this is the supplemental

9  handbook that I received upon entry into SCI Huntingdon.

10          THE COURT:  This was the first document that you

11  referenced, I believe, in your testimony?

12          MR. HARRIS:  Yes.

13          THE COURT:  And this is entitled Civil Action No. 115

14  CV-1411, and it's handwritten issued March 20th, 2014, and it

15  is typewritten Exhibit 10, and it's also handwritten SCI

16  Huntingdon Inmate Handbook Supplement 2014.

17          What we will do is, we will identify this as

18  Plaintiff's Exhibit No. 1 for purposes of this hearing.

19     (At this time, Plaintiff's Exhibit No. 1 was marked for

20  identification.)

21          THE COURT:  What is the other document?

22          MR. HARRIS:  This document is the other supplemental

23  handbook I received on January 7th of 2017.

24          THE COURT:  And this is a document that is

25  typewritten on top.  It is says Civil Action No. 1 CV 15-1411,

1  handwritten issued January 7th, 2017, with a typewritten

2  Exhibit 12, and then underneath it, it's handwritten SCI

3  Huntingdon Inmate Handbook Supplement 2017.

4          We will mark this as Plaintiff's Exhibit No. 2.

5      (At this time, Plaintiff's Exhibit No. 2 was marked for

6  identification.)

7          MR. HARRIS:  Yes, Your Honor.

8          This is the same thing you have in reference to the

9  SCI -- the DOC handbook, which is Exhibit 11.  This is a copy

10  of the grievance policy in there which does not state anything

11  about monetary compensation on the initial grievance.

12          THE COURT:  This is another document that's entitled

13  Civil Action No. 115 CV-1411, handwritten issued May 4th, 2017,

14  typewritten Exhibit 11, and underneath that is handwritten

15  Inmate Handbook 2017 edition, and we will mark this as

16  Plaintiff's Hearing Exhibit No. 4 for identification purposes.

17          MR. PALADINA:  May I review those documents, Your

18  Honor?

19          THE COURT Yes, you may.

20      (At this time, Plaintiff's Exhibit No. 4 was marked for

21  identification.)

22          MR. HARRIS:  Now can I continue?

23          THE COURT:  Just give him a moment to review the

24  documents, and we will let you know when he has completed his

25  review.

1        MR. HARRIS:  Did you need to make copies of these?

2        THE COURT:  We will make copies of those before you

3 leave.  We will take care of them before you leave.

4        You may continue with your direct testimony.

5        MR. HARRIS:  Your Honor, just please bear witness and

6 be patient with me, because I was the picture of health upon

7 entering SCI Huntingdon on March 20th of 2014, Your Honor.  I

8 was running track and I was doing everything that a healthy

9 inmate would do.

10        By being on Block CA for four years, inhaling

11 environmental tobacco smoke, and being a level 2 custody, SCI

12 Huntingdon refused to move me due to the fact that I always

13 submitted grievances on the officers for wrongdoing and smoking

14 on the block.

15        Your Honor, I have in my possession documentation of

16 officers smoking on the block, their names and their dates of

17 entry and the year and the month that I caught them smoking on

18 the Block of CA and the utility room of Block CA.

19        Your Honor, if I could grab that, if you will let me?

20        THE COURT:  We will afford you that opportunity.

21        MR. HARRIS:  Your Honor, every time I caught an

22 officer smoking on the block, I documented it.

23        From 11/23/16 -- okay, from 1/5/15, which I started

24 this documentation of all the officers, all the way up to

25 11/23/16.  Every time I seen an officer smoking in the utility

1  room, I documented it.

2          Can I read one of the excerpts, Your Honor?

3          THE COURT:  Yes.

4          First, before you do that, can you explain to me why

5  is this relevant to the issue of whether you received the

6  inmate handbook?  How is that relevant to that?

7          MR. HARRIS:  This is relevant, Your Honor, because

8  the no-smoking policy is not enforced on Block CA or in

9  Huntingdon Prison at all.  It's not enforced.

10          THE COURT:  I recognize that that's your position

11  contained in your complaint that's the subject matter of this

12  proceeding, not today's proceeding, but the proceeding in

13  general.

14          Today, Mr. Harris, we are here for one exclusive

15  purpose, and that is for the determination of whether or not

16  you received the inmate handbook that contained that particular

17  language.

18          We are not here to try the whole case.  That would be

19  for another day.  Do you understand that?

20          MR. HARRIS:  Yes, Your Honor.

21          As I was saying -- and this is my right hand to

22  God -- I never received any inmate handbook at SCI Graterford.

23  I never received an inmate handbook at SCI Camp Hill.  The only

24  handbook that I received and I recognize are these handbooks

25  that I have right here from three years ago, and I kept these

1  in my possession and I cherish these, because this is where I

2  found out all of the information that I understand today about

3  the rules and the regulations of the prisons.

4         THE COURT:  So the record is clear, you are referring

5  to Plaintiff's Exhibits 1, 2, 3 and 4?

6         MR. HARRIS:  This is all I have in my possession.

7         Now, when they gave you this book at SCI Huntingdon,

8  I had to sign a waiver stating that I got this book.

9         THE COURT:  That's Exhibit 3 that you're referring

10 to?

11        MR. HARRIS:  Yes.  This waiver that I received this

12 book is on record at SCI Huntingdon stating that I received

13 this book, because if this book is lost or destroyed, I will

14 have to pay for another one.  I'm an indigent inmate.  I don't

15 have funds like that.

16        So I held onto everything that I have and material to

17 all the prisons that I was at, Your Honor.  That's all I could

18 say.

19        THE COURT:  Is that the conclusion of your direct

20 testimony?

21        MR. HARRIS:  Yes, Your Honor.

22        THE COURT:  Do you need a break?

23        MR. HARRIS:  Yes.

24        THE COURT:  We will take a 5-minute recess, and then

25 we will continue with your cross examination.

1     (At this time, a 5-minute recess was taken.)

2          THE COURT:  Are you prepared to continue on,

3  Mr. Harris?

4          MR. HARRIS:  Yes, sir.

5          THE COURT:  Mr. Paladina, you can cross-examine.

6                      CROSS EXAMINATION

7  BY MR. PALADINA:

8  Q.    I have just a few questions for you, sir.

9        This is your grievance, Exhibit G, right?

10 A.    Yes.

11 Q.    And it says right there for No. 1, it says refer to the DC

12 ADM 804 for procedure, right?

13 A.    Yes.

14 Q.    And you were in the law library, right?

15 A.    Excuse me?

16 Q.    You had access to the law library at Huntingdon and you

17 were there often, is that correct?

18 A.    I was there occasionally, yes.

19 Q.    Why didn't you ask to look in the law library?  Why didn't

20 you ask to look at the DC ADM 804?

21 A.    Because I'm a first-time offender.  I've never been in

22 prison before.  I don't even know the procedures within a

23 prison.  I've never ever been in prison ever before in my life

24 up until now.  I don't know any regulations or rules in

25 reference to being in a law library.  I did not know that you

1  could do that.

2  Q.    Sir, it says state all relief that you are seeking right

3  there on the form in bold, right?

4  A.    Could you repeat that, please?

5  Q.    Take a look at Exhibit G on the screen in front of you.

6      Do you see where it says state all the relief that you are

7  seeking in bold?

8  A.    I don't ever recall seeing that, Your Honor.

9  Q.    Well, is it there?

10  A.    Yes.  I've never really seen this before.

11  Q.    But you don't dispute that it was there when you filed the

12  grievance, right?

13  A.    I seen it there, but I've never seen it on my grievances

14  that I have wrote, and I have wrote many grievances, because if

15  I had seen that, I would have declared monetary compensation on

16  all of my grievances.

17  Q.    So the reason why you didn't ask for money damages was

18  because you didn't see that statement there?

19  A.    I never knew this was there, no.

20  Q.    I have to ask you, sir, you testified about some

21  unfortunate medical history.

22      You said you were on life support and for that reason

23  everything is fuzzy before then?

24  A.    Yes.

25  Q.    When were you on life support?

1  A.    Why?

2  Q.    When.

3  A.    This was in January of 2016 -- from January of 2016, I

4  went in the hospital, and I can't remember when I came out.

5  Q.    Okay.  But prior to that time your memory is fuzzy,

6  correct?

7  A.    Yes.

8  Q.    And you have testified over and over again about there

9  should be a receipt saying that you acknowledge receipt of the

10  inmate handbook from Camp Hill, correct?

11  A.    I've never received a handbook at Camp Hill.

12        Can I ask a question?

13        THE COURT:  Well, it's cross examination.

14  BY MR. PALADINA:

15  Q.    Sir, I'm showing you what has been admitted into evidence

16  as Exhibit C.  That's your signature, right?

17  A.    That appears to be -- I usually write small A, small J,

18  and Harris.  That's how I usually sign things.

19  Q.    Sir, I'm just going to show you your signature on the

20  complaint in this case.

21        You wrote out your full name on there, right, Arnold J.

22  Harris?  You didn't use A.J. Harris.

23  A.    Yes.  It doesn't look like that.

24  Q.    Didn't you say when you were sitting at counsel table when

25  we discussed this exhibit before, Exhibit C, that you must not

1 have realized what you were signing?

2 A.   Excuse me.  Could you repeat that?

3 Q.   When we covered this exhibit in testimony, you were

4 sitting here at counsel table, didn't you say to the Court and

5 to all of us that you must not have realized what you were

6 signing?

7 A.   I might not have, yes.

8 Q.   And since your memory is fuzzy from back then, it's

9 possible that you did receive a handbook, right?

10 A.   No.  I can remember being at Camp Hill and I remember that

11 I entered Camp Hill -- let me see.  I left Graterford -- there

12 are certain things that are fuzzy.

13      I entered Camp Hill on November 18th of 2015 (sic), and I

14 was at Camp Hill until I came to SCI Huntingdon, which is March

15 20th, 2014.  I never received a handbook, because I would have

16 remembered that.  Certain things are kind of blacked out and

17 certain things are not.

18      I remember my time at Camp Hill.  I don't remember seeing

19 that man right there.  I don't remember his face.  I remember

20 seeing a younger white man that grilled me to no end

21 repeatedly, and when I went to orientation with him, he threw

22 me out of the office, because the sergeant sent me over there

23 at quarter to 4, and I had kept asking the sergeant that I had

24 to go to orientation, and that man sent me out.  That's what I

25 remember.

1      I don't remember Mr. Moore, and I don't ever remember

2  receiving an inmate handbook, because if I did, believe me, I'm

3  a good keeper of records.  This is a proven fact.  This one, I

4  received this three years and four months ago and I still have

5  it and it's in mint condition.

6           MR. PALADINA:  Judge, that's all the questions I

7  have.

8           THE COURT:  Now, the defendants have no further

9  questions for you.

10           Do you have any redirect examination that's limited

11  solely to the questions that were asked regarding cross

12  examination?

13           MR. HARRIS:  Your Honor, I would like to really state

14  that my condition, as far as me being here and being on these,

15  for the record, I would really like to state it was due to

16  environmental tobacco smoke.  I was never on these before.

17           THE COURT:  You're referring to your inhalers, is

18  that correct?

19           MR. HARRIS:  Yes.

20           Your Honor, I received this January 1st of 2015 when

21  I went to get examined by the doctor and physician's assistant

22  at Huntingdon.  He gave me an appointment to a follow up to

23  come back in April to medical at SCI Huntingdon.

24           The doctor examined me and said my asthma has gotten

25  worse.  He prescribed Alvesco when he listened to my lungs, and

1 he prescribed me this in lieu of this, and that was in 2015

2 from constantly breathing in secondhand smoke.

3         Now, as of 2016 to 2017, I have been diagnosed with

4 chronic obstructive pulmonary disease in my lungs, COPD, as due

5 to cigarette smoke.

6         I was the picture of health coming into SCI

7 Huntingdon.  I never had these before.  I never really needed

8 these.  SCI Huntingdon has damaged me to the point where I

9 can't even breathe.

10         Your Honor, I just want them punished for the damage

11 they have done to me.  I can't even walk, Your Honor.  I need

12 oxygen the rest of my life.

13         Your Honor, they won't even move me off of CA.  They

14 won't even move me to A Block.  I keep telling them, the

15 officers, and they tell me, if you don't like prison, then

16 don't come to a prison.  This is what I'm told.

17         I can't even breathe now from the secondhand smoke.

18 I'm cursed to carry these for the rest of my life, Your Honor,

19 due to being in SCI Huntingdon and on the CA Block.  Why can't

20 they move me to a safer block?

21         THE COURT:  As you know, that is not the issue that

22 is before me, Mr. Harris.

23         I understand your concern and your request, but the

24 issue that is before me is the issue of whether or not you

25 received the inmate handbook.

1          MR. HARRIS:  No, Your Honor.

2          THE COURT:  I understand your position.  Your

3 position is that you did not receive it.

4          MR. HARRIS:  Yes, Your Honor.

5          THE COURT:  The defendant's position is that you did

6 receive it first at your orientation at Camp Hill and --

7          MR. HARRIS:  It's a lie.

8          THE COURT:  -- thereafter they claim that you had

9 access to it and you could have requested a copy of it at the

10 law library or by asking any block officer to provide you with

11 the proper documentation forms and so on.

12          MR. HARRIS:  I didn't know.  It wasn't communicated

13 to me.

14          THE COURT:  I understand your position and I

15 understand their position.

16          So the question now is, do you have anything else

17 relevant to the issue of the receipt of the inmate handbook?

18          MR. HARRIS:  No, Your Honor.

19          THE COURT:  Do the defendants have anything further

20 with respect to that issue?

21          MR. PALADINA:  Not evidentiary, Your Honor.

22          I have a couple of legal cases I would like to bring

23 to the Court's attention.

24          THE COURT:  All right.  Mr. Harris, you may step

25 down.  Be careful getting down.  We will be sure that your file

1  gets back to you.

2         So that the record is complete, on the issue of

3  Plaintiff's Exhibits 1 through 4, I will ask Ms. Schirra, our

4  courtroom deputy, if she would make copies of those and provide

5  a copy to the defendants, the court stenographer, and we will

6  provide the originals then to Mr. Harris.

7         Mr. Paladina, do you have something further?

8         MR. PALADINA:  Yes, Your Honor.  I have a couple

9  cases, and I will give a copy to Mr. Harris, but I want to

10 bring them to the Court's attention.

11        This is a Third Circuit non-precedential case, Watson

12 versus Fisher, filed at 558 Fed. Appx. 141.  It talks

13 specifically about the issue before us today.

14        In this case, an inmate claimed he didn't get the

15 actual procedures, he didn't get the actual handbook, but when

16 he filed a grievance, they instructed him on how to do it

17 properly.

18        So the Third Circuit agreed with the district court

19 and found out that even if they didn't provide him with actual

20 copies of the handbook and procedures, that didn't preclude him

21 from exhausting his administrative remedies.

22        So I think the question of law really is, has he

23 actually received it, were the procedures available to him to

24 look at, especially in light of on the form itself it says

25 refer to the 804 and state relief you're seeking.

1          Secondly, this other case is just a summation of the

2    law, and I'm not offering it for its facts, but it's Walker

3    versus Fisher, and this is a recent summation of the law by

4    Judge Rambo.

5          I highlighted a particular portion that cites the

6    standard, an inmate's confusion regarding the grievance

7    procedure does not standing alone excuse a failure to exhaust,

8    and it actually applies the ignorance of the law standard to

9    this, citing another case dealing with ignorance of the law.

10          I would say that those are important cases to look at

11   for whatever conclusions of the law the Court may come up with.

12          Thank you.

13          THE COURT:  Mr. Harris, do you have any closing

14   remarks?

15          MR. HARRIS:  Excuse me?

16          THE COURT:  Do you wish to make any closing remarks?

17          MR. HARRIS:  Your Honor, I just want to get cured,

18   that's all.  There is no repercussion in secondhand smoke, Your

19   Honor, or COPD.  It's irreversible.  I just want to breathe

20   right again, and I don't think I will ever be able to, Your

21   Honor.

22          THE COURT:  I will afford the parties an opportunity

23   to make proposed findings to me and conclusions of law as well.

24          First I will ask from the defendant's perspective,

25   how much time do you need?

1          MR. PALADINA:  Can I have 20 days, Your Honor?

2          THE COURT:  Twenty days from the receipt of the

3    record.

4          MR. PALADINA:  Okay.

5          THE COURT:  We anticipate that the record will be

6    promptly, but I certainly defer to the court stenographer in

7    terms of when we'll have it.

8          We will direct that you will provide proposed

9    findings of fact and conclusions of law within 20 days from

10   receipt of the record.

11         MR. PALADINA:  May that be filed electronically, Your

12   Honor?

13         THE COURT:  Yes.  You can put that on the docket.

14         Mr. Harris, that applies to you as well, sir.

15         Upon your receipt of the record in this case, you

16   will have 20 days within which to make proposed findings of

17   fact and conclusions of law.

18         Do you understand that, sir?

19         MR. HARRIS:  Excuse me?

20         THE COURT:  Within 20 days from your receipt of the

21   formal transcript in this case that was handled here today, you

22   will have 20 days from the date you received the transcript to

23   make proposed findings of fact and conclusions of law, and you

24   could upload those onto the ECF system like you have been doing

25   in the past.

1          MR. HARRIS:  That is not available to me at the

2   prison, Your Honor.  I can't upload anything at the prison.

3          THE COURT:  You will implement the same procedure

4   that you have been using throughout the duration of this case.

5          MR. HARRIS:  Your Honor, the proceedings that I found

6   that Mr. Paladina gave me in reference to what he stated, I

7   will have 20 days to argue on that?

8          THE COURT:  Yes.  You will have 20 days to send to me

9   a document that is entitled Plaintiff's Proposed Findings of

10  Fact and Conclusions of Law.

11          In that document, you will set forth what you believe

12  the facts -- how I should find the facts as a result of today's

13  hearing and how I should conclude on any legal issues as a

14  result of today's hearing.

15          MR. HARRIS:  So send you facts, right, Your Honor?

16          THE COURT:  Facts and conclusions of law, legal

17  conclusions.  Okay?

18          MR. HARRIS:  Okay, Your Honor.

19          THE COURT:  You will have 20 days from the day that

20  you receive the transcript.

21          MR. HARRIS:  Which is today?

22          THE COURT:  No.  You will not receive the transcript

23  today.

24          The court stenographer will prepare the record, and

25  then it will be sent to you and to counsel for purposes of your

1    preparation of the proposed findings and conclusions of law.

2          MR. HARRIS:  But I don't have any counsel to

3    represent me, Your Honor.

4          THE COURT:  I recognize that, but I also recognize

5    that I think you have done a very good job in representing

6    yourself, not just at today's proceeding, but throughout the

7    past.

8          In the past, you have done a very good job in filing

9    your documents and preparing your documents and trying to make

10   your arguments as succinctly as possible.

11         So I think at this point we will continue on with

12   this issue.  The issue is not very difficult to decide one way

13   or the other.

14         The issue, as we have identified it before, is

15   whether you received the policy and whether they were

16   reasonably available to you, as I understand the law on the

17   issue, and whether you had reasonable access to the rules and

18   regulations of the Department of Corrections.

19         MR. HARRIS:  That's what I'm ruling on, Your Honor,

20   if the documentation was reasonably available to me and I

21   should have known?

22         THE COURT:  And whether the remedy of monetary

23   compensation was reasonably communicated to you as an inmate.

24         MR. HARRIS:  Your Honor, I will do my best.

25         THE COURT:  And that is all we are asking you to do.

60

1          Anything further?

2          MR. PALADINA:  No, Your Honor.

3          THE COURT:  Thank you all for coming today.  We are

4   adjourned.

5               (At this time, the proceedings in the

6               above-captioned matter adjourned.)

REPORTER'S CERTIFICATE


    I, Suzanne A. Halko, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further   certify that the foregoing transcript has been prepared by me or under my supervision.


_____
Suzanne A. Halko, RMR, CRR
Official Court Reporter


REPORTED BY:

SUZANNE A. HALKO, RMR, CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    Scranton, PA  18501-0090


    (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)